## CROSSLAND v. KENTUCKY BLUE GRASS·SEED GROWERS' CO-OP. ASS'N.

### No. 7812.

Circuit Court of Appeals, Sixth Circuit.
May 5, 1939.

Rufus Lisle, of Lexington, Ky. (Bloodgood, Kemper & Passmore, of Milwaukee, Wis., and Rufus Lisle and Hunt & Bush, all of Lexington, Ky., on the brief), for appellant.

D. L. Pendleton, of Winchester, Ky. (D. L. Pendleton, of Winchester, Ky., on the brief), for appellee.

Before HICKS, SIMONS, and ARANT, Circuit Judges.

SIMONS, Circuit Judge.

In an action by the appellant for breach of an executory written contract, partly performed, the District Court sustained a motion to dismiss in the nature of a demurrer on the ground that the contract lacked the essential element of mutuality, and that its terms were too vague and indefinite to afford a basis for adjudicating liability. In this situation it becomes necessary to consider the writing, the situation of the parties, and the allegations of the petition in respect to circumstances attending its execution in the light most favorable to the plaintiff.

The defendant is a Kentucky corporation, organized, as its name implies, for the purpose of acquiring and selling blue grass seed grown and produced in Kentucky and elsewhere. At the time of the execution of the agreement it owned approximately 16,700,000 pounds of seed which it had been unable to sell. The plaintiff is a citizen and resident of Wisconsin who had for many years been engaged in the business of selling seed and had established a wide acquaintance with dealers therein throughout the United States and in foreign countries. In February, 1934, he was invited to meet with the officers of the defendant to discuss his employment as special sales representative to aid in marketing accumulated stock. As a result of the conference

the contract printed in the margin[1] was executed.

It will be noted in the preamble that the defendant was the owner of seed which it desired to sell, that the plaintiff was to become its employee for that purpose, to devote but part of his time and effort in the sale. It will also be noted that a drawing account was made available to him for three months, the amounts thereof to be charged against his commission of 5%, and that the contract was to be ineffective in the event of sale or other disposition of seed then held by the association, and was to be subject to confirmation by its Board of Directors. On February 17, 1934, Crossland was advised by the president of the appellee that his appointment as special general sales representative had been confirmed and that all orders received as a result of his efforts, either by personal contact, through circularization, and including repeat orders, would be recognized as entitling him to the full rate of the agreed commission. On the same date the wholesale seed trade of the United States and Canada was circularized to the effect that the association's Board of Directors had solicited and engaged the services of the appellant after a careful inquiry into his ability, and that he had authority to quote prices, subject to confirmation of orders.

On June 4th the appellee advised Crossland by letter that the proceeds of sales were then sufficient to discharge its debt to the Federal Intermediate Credit Bank, that it was its understanding that the contract did not extend beyond June 1st, that it was not binding upon the association until ratified by proper action of the Board of Directors, who had refused to ratify it, and that it was now desired to close accounts and to cancel the contract.

---

[1] Whereas, the Association is the owner of Kentucky Blue Grass Seed which it desired to sell, and

Whereas, the said W. H. Crossland desires to become an employee of the Association for the purpose of devoting part of his time and efforts in selling the said seed.

Now, Therefore, in consideration of the mutual promises set forth herein, it is understood and agreed as follows:

1. The association agrees to employ said W. H. Crossland as its Special General Sales Representative. The Sales Representative agrees:

(a) That the monthly drawing account allowed him by the Association shall be charged to him and deducted from his commission on sales of the said seed;

(b) That he specifically agrees to the compensation hereinafter set forth and the time and manner of payment of the same.

The Association further agrees:

(a) That it will make available to the Sales Representative for the ensuing three (3) months a monthly drawing account of $500.00, payable $250.00 on the first and $250.00 on the 15th of each month—the first of which payments will be made March 1, 1934, and extending to and including the last payment which will be made May 15, 1934;

(b) That it will pay a commission of five per cent (5) to the Sales Representative on the net amount of invoices upon the consummation of approved sales of the said seed, Provided, However, that no part of said commission will be paid or credited to the account of the Sales Representative unless and until the proceeds of the sales shall have been received by the Association. Settlement will be made by the Association with the Sales Representative on or before the 10th of each calendar month for commissions due upon seed sold by him, payment for which has been received by the Association on or before the last day of the preceding month.

(c) It is understood and agreed that earned commissions shall be subject to deductions for advances made upon the drawing account hereinabove referred to.

It is further understood and agreed between the parties that the Sales Representative shall have the right to offer and sell merchandise for other parties. It is not the intention of the Association nor of the Sales Representative that he devote all of his efforts and time to the Association's business.

It is further understood and agreed that this contract may be cancelled by and with the mutual consent of the Association and the Sales Representative and that it will be ineffective for all purposes in the event of the sale or other disposition of the Kentucky Blue Grass Seed now held by the Association.

In Witness Whereof, the parties hereunto set their hands and seals at Louisville, Kentucky, this 13th day of February, 1934, but it is expressly understood and agreed that this contract shall not be binding upon the Association unless and until the action of its officers in executing the same for and on its behalf shall have been ratified by proper action of the Board of Directors of the Association.

In his petition the plaintiff avers that after the contract was executed and at great expense of time and money he circularized dealers over a wide area at great expense, visited many places for the purpose of furthering the selling of seed, and sold a quantity of it for the aggregate sum of $66,640.52, receiving the agreed commissions thereon; that on June 4, 1934, when the defendant undertook to cancel the agreement it still had in its hands unsold in excess of 3,411,000 pounds; that he could and would have sold the seed then remaining at defendant's prices to solvent and responsible persons, and that by reason of the defendant's cancellation he lost commissions thereon and was damaged in the sum of $30,000.00.

The contract is, of course, indefinite in at least two respects. It does not recite specific acts which the sales representative was obliged to perform, and it is indeterminate as to its duration. This indefiniteness does not, however, justify a conclusion that it is unilateral and so wanting in mutuality. Obligations may be implied even when incapable of exact measurement, and the test of performance is then the exercise of good faith and the expenditure of reasonable effort to the end that the agreement may be fruitful to the contracting parties. Or it may be that a consideration of the circumstances attending the execution of the contract, the custom and usages of trade and local standards, will make definite obligations which the writing leaves indefinite. It was said in an English case: "You cannot have a description in writing that will shut out all controversy, even with the help of a map." Shadlow v. Cottrell, L.R. 20, Ch.D. 90. The modern rule is that an obligation will be implied where it is clear that such was intended. Marks v. Cowdin, 226 N.Y. 138, 123 N.E. 139; Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 90, 118 N.E. 214; Remington-Rand Business Service v. Walter J. Peterson Co., 6 Cir., 58 F.2d 11; Globe Steel Abrasive Co. v. National etc., Co., 6 Cir., 101 F.2d 489. We do not understand Kentucky law to be otherwise. Kentucky Tobacco Products Co. v. Lucas, 5 F.2d 723, D.C.; Carter v. Hall & Martin, 191 Ky. 75, 229 S.W. 132.

Where the duration of a contract is indefinite, the general rule is that the contract must be performed within a reasonable time. 1 Restatement, Contracts, 53. It is likewise the Kentucky rule. Put-

nam v. Producers' Live Stock Marketing Association, 256 Ky. 196, 75 S.W.2d 1075, 100 A.L.R. 828. The contention is here made that an inference arises from the limitation of the period during which the drawing account was available to the plaintiff that the agreement was not to continue beyond that time. Equally reasonable, however, is an inference that the drawing account was to be available to the sales representative during the period of preliminary advertising and promotion, and that when sales began to produce commissions it would no longer be required. No conclusion as to duration may therefore without more be drawn. We are unable to assent to the view of the appellee that the court took judicial notice of seasonal sale periods and local customs to sustain cancellation of the contract since the record indicates nothing with respect thereto and the memorandum and order of the court suggest no reliance upon such standards of judgment.

It may be that the plaintiff will be unable to prove damages. His difficulties in that respect are admittedly great. He should, however, have been given the opportunity to present his case and to receive thereon the judgment of the court or jury.

Judgment reversed and the case remanded for trial.